Filed 11/3/22  In re Emely R. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re EMELY R., a Person Coming Under the Juvenile Court Law. | B316945 (Los Angeles County Super. Ct. No. 21CCJP05046A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. ESTHER R., Defendant and Appellant. | |

APPEAL from the orders of the Superior Court of Los Angeles County, Philip L. Soto, Judge.  Affirmed.

Christopher R. Booth, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Stephen Watson, Deputy County Counsel, for Plaintiff and Respondent.

* * * * * *

Esther R. (mother) appeals the juvenile court orders asserting dependency jurisdiction over her newborn daughter Emely R. (Emely), and removing Emely from her custody. Because both orders are supported by substantial evidence, we affirm.

## FACTS AND PROCEDURAL BACKGROUND

### I.      Family

Mother has five children—Erick R., Monica R., David R., Ismael M., and Emely.  I.D. is the father of the youngest four children.

### II.      Termination of Parental Rights over Mother's Middle Three Children

In 2018, the juvenile court initially exerted dependency jurisdiction over Monica, David, and Ismael after finding that mother was unable to care for the children because she housed them in a residence that was literally crawling with roaches, coated in dirt and grime, littered with trash and un-sprung mouse traps, and snaked throughout with electrical cords.  A psychological evaluation prepared in 2019 opined that mother

2

has "[l]ow-[a]verage intellectual function range" resulting in "difficulties grasping abstract concepts" and that mother may also be depressed. After mother failed to reunify with the children, the juvenile court terminated her parental rights over those children in February 2021.

## III.    Emely Is Born

Eight months after her parental rights over her middle three children were terminated, mother gave birth to Emely in the bathroom of father's sister's (aunt's) apartment. After giving birth, mother walked out of the bathroom and handed the newborn to the aunt. The aunt then insisted that mother and Emely be taken to the hospital.

Mother was not prepared to care for a newborn. While insisting that she was "ready" to care for Emely and had supplies necessary to care for a newborn (such as clothes, diapers and baby food), mother did not have supplies. After nurses at the hospital reported that mother seemed unprepared, a social worker from the Los Angeles Department of Children and Family Services (the Department) interviewed mother. During interviews conducted in the days after Emely's birth, the social worker observed that mother gave "short," undetailed and unclear answers to questions, and would often stare blankly in response to questions. When asked why she had (falsely) represented that she had supplies for the newborn, mother just stared back in response and gave no answer. When the social worker observed that there was a blanket in the baby's bassinette that could pose a smothering hazard, mother did not remove the blanket and instead just sat there; the social worker had to remove the blanket for mother.

Mother was living with the aunt (and the aunt's family) for a few months after Emely was born. Because mother was often distracted and inattentive, the aunt would have to remind mother to feed Emely when the aunt was not at work herself. Mother eventually moved out of the aunt's residence with the baby.

The people who knew mother best—namely, aunt and father—unequivocally indicated their opinion that mother was not able to take care of a newborn like Emely.

## IV. The Department Files a Petition

In November 2021, the Department filed a petition asking the juvenile court to exert dependency jurisdiction over Emely. In the operative first amended petition filed a few weeks later, the Department alleged that dependency jurisdiction was appropriate due to (1) mother's difficulty in grasping abstract concepts, which "limits [her] ability to provide regular and ongoing care for [Emely] in that [mother] is unable to make insightful and necessary decisions for the child" (such as when to feed and change her), and which accordingly "endangers [Emely's] physical and emotional health and safety . . . and places [her] at risk of serious physical harm" (thereby warranting the exercise of jurisdiction under Welfare and Institutions Code section 300, subdivision (b)(1)),[1] and (2) mother's exposure of Emely's three older siblings to a "filthy, unsanitary and hazardous home environment" also places Emely at risk of serious physical harm (thereby warranting the exercise of jurisdiction under subdivision (j) of section 300).

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

**V.      Exertion of Dependency Jurisdiction and Removal**

The juvenile court held a combined jurisdictional and dispositional hearing in late November 2021.  After the parties argued (but submitted no further evidence), the court sustained both allegations.  The court also removed Emely from mother's (and father's) custody, finding clear and convincing evidence that placing Emely with them would "be detrimental to [Emely's] safety, protection, [and] physical [and] emotional well-being" and that there was "no reasonable means to keep the child safe without removal."

**VI.   Appeal**

Mother filed this timely appeal.

**DISCUSSION**

Mother argues that the juvenile court erred (1) in asserting dependency jurisdiction over Emely because neither allegation supporting jurisdiction is supported by sufficient evidence, and (2) in removing Emely from her custody because that order was also not supported by sufficient evidence.  We review a juvenile court's finding of dependency jurisdiction for substantial evidence, asking whether the record—when viewed as a whole and drawing all inferences in support of the court's finding—contains ""sufficient facts to support [that] finding."" (*In re I.J.* (2013) 56 Cal.4th 766, 773 (*I.J.*).)  We review a juvenile court's removal finding for substantial evidence as well, but we must find substantial evidence to support that finding by clear and convincing evidence.  (*In re V.L.* (2021) 54 Cal.App.5th 147, 149.)

**I.      Jurisdiction**

The juvenile court upheld jurisdiction in this case on two different grounds.  With respect to the first ground, a juvenile court is empowered to assert dependency jurisdiction over a child

5

if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of the child's parent . . . to adequately supervise or protect the child." (§ 300, subd. (b).) With respect to the second ground, a juvenile court is empowered to assert dependency jurisdiction over a child if (1) "[t]he child's sibling has been abused or neglected, as defined in subdivision (a), (b), (d), (e) or (i)" of section 300, and (2) "there is a substantial risk that the child will be abused or neglected" under those same subdivisions. (§ 300, subd. (j); *I.J.*, *supra*, 56 Cal.4th at p. 774.) Under both grounds, *risk* of harm means just that: The juvenile court "need not wait until a child is seriously abused or injured to assume jurisdiction." (*In re Kadence P.* (2015) 241 Cal.App.4th 1376, 1383 (*Kadence P.*); *In re Yolanda L.* (2017) 7 Cal.App.5th 987, 993.) Further, when it comes to assessing that risk, the juvenile court may look to a parent's past behavior as a "good predictor" of whether the child is currently at risk. (*In re T.V.* (2013) 217 Cal.App.4th 126, 133; *Kadence P.*, at pp. 1383-1384.)

Substantial evidence supports the juvenile court's jurisdictional findings under both subdivisions (b) and (j) of section 300. The record indicates that mother has been diagnosed with having some intellectual challenges; that those challenges prevented mother from maintaining a safe and sanitary home for her middle three children; that those challenges are currently preventing her from caring for Emely because, without the social worker's or aunt's advice, she forgets to feed and tend to Emely and allows her to sleep in a bassinette that is dangerous because it contains a loose blanket; and that Emely's status as a newborn unable to care for herself *at all* means that mother's inability to care for Emely placed her at

6

substantial risk of physical harm through malnutrition, illness or even more dire consequences. What is more, mother is in complete denial about her special challenges, and her denial also places Emely at risk. Indeed, father and aunt—who have firsthand knowledge of how mother cares for children—both agree that mother is incapable of caring for a newborn like Emely.

Mother resists this conclusion with what boil down to three arguments.

First, mother argues that her mother's intellectual challenges and her "difficulty grasping abstract concepts" do not put Emely at risk, and that the concern about the "loose blanket" in Emely's bassinette "is unbelievably absurd" and "extraordinarily nitpicky" because "[e]verybody knows babies need blankets." We reject this argument because it ignores that the mother's intellectual challenges and difficulty in grasping abstract concepts are the root cause of why mother is inattentive and distracted, and thus unable to care for a newborn on her own. Mother's criticism of the Department's concern about the blanket, apart from being unprofessionally snide and unbecoming of an officer of the court, is also misplaced: The Department's chief concern was not that mother may have unwisely placed the blanket in the bassinette in the first place but that she made no move to remove the blanket when advised of how unsafe it was. And mother's comment "everybody knows babies need blankets" misses the mark: Everybody knows that babies also need to ingest liquids, but that does not mean that allowing a baby to crawl unattended alongside a swimming pool is somehow safe.

Second, mother argues that Emely currently faces no risk of harm because she is living in aunt's residence, which is safe,

and because Emely's siblings lived in a filthy house several years earlier. We also reject this argument. It ignores aunt's report that mother moved away prior to the jurisdictional and dispositional hearing. And even if mother moved back in with aunt, aunt has a job and is not following mother around 24/7; it only takes a moment for a newborn or infant to be placed in peril, and mother will be spending many moments without aunt's assistance. Mother's argument also ignores that the danger to Emely does not stem from mother's poor housekeeping skills three years ago, but rather from mother's fundamental inability to remain focused enough to care for young children. That inability most certainly poses a risk to a newborn like Emely.

Third, mother cites precedent that she says dictates a ruling in her favor. We disagree. She cites several cases that upheld dependency jurisdiction but involved more egregious facts (e.g., *In re Kristin H.* (1996) 46 Cal.App.4th 1635; *In re Rocco M.* (1991) 1 Cal.App.4th 814), but none of these cases purported to set the floor for finding jurisdiction, so they are not dispositive. Mother also argues that mental illness alone is insufficient to justify dependency jurisdiction. This is true (e.g., *In re A.L.* (2017) 18 Cal.App.5th 1049-1050), but also beside the point because there is substantial evidence in the record linking mother's intellectual challenges to resulting conduct that has placed her children at risk of physical harm.

## II. Removal

Once a juvenile court exerts dependency jurisdiction over a child, it may remove the child from her parent only if it finds, by clear and convincing evidence, that (1) "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the [child] if the [child] were

8

returned home," and (2) "there are no reasonable means" short of removal "by which the [child's] physical health can be protected." (§ 361, subd. (c)(1).)

Substantial evidence supports the juvenile court's removal finding. To begin with, the record contains substantial evidence to support a finding, by clear and convincing evidence, that Emely would face a substantial danger to her physical well being if not removed from mother because mother's intellectual challenges placed her middle three children in harm's way and because mother appears to be suffering from the same inattentiveness vis-à-vis Emely. Further, the record contains substantial evidence to support a finding, by clear and convincing evidence, that no reasonable means short of removal could protected Emely. Citing *In re Henry V.* (2004) 119 Cal.App.4th 522, 529-530 (*Henry V.*), and *In re Basilio T.* (1992) 4 Cal.App.4th 155, 171-172 (*Basilio T.*), mother urges that unannounced visits or in-home assistance might suffice or that the danger in this case is not sufficiently "extreme." We disagree that unannounced visits would suffice, because unannounced visits would not protect Emely unless they occurred all the time because Emely, as a newborn, would be in jeopardy whenever she was left alone in mother's care. Periodic check-ins might come too late. (Cf. *Henry V.*, at pp. 529-530 [unannounced visits may be a viable alternative to check on bruises due to excessive child discipline, at least where discipline is a one-time incident and the parent has embraced counseling].) In-home assistance is also not a feasible option. That is because protecting against mother's inattentiveness and distraction would necessitate around-the-clock assistance seven days a week, something no court has yet mandated as a prerequisite to removal. And the danger in this

9

case *is* sufficiently extreme because the danger to Emely comes from her being so helpless as an infant that mother's failure to feed her or to respond to dangers places Emely in peril whenever someone is not watching mother watch Emely. (Cf. *Basilio T.*, at pp. 171-172 [children not in danger due to two incidents of domestic violence by parents occurring out of the children's presence].)

Mother musters two arguments in response. First, she argues that Emely was "fine" in the care of mother *and aunt*, "with Department oversight." This argument ignores that mother is no longer living with aunt and, as noted above, that aunt's absence while working and tending to her own life leaves Emely unprotected. Second, mother accuses the juvenile court of embarking upon a "breathtaking verbal barrage" because it presented mother with her options going forward in stark terms: Give up your children to adoption, take reunification seriously and get them back, or fail to take reunification seriously and face losing her parental rights. We see nothing problematic about the court's underlying message. Mother's accusation that the court treated termination of mother's parental rights over Emely as a "fait accompli" utterly ignores the trial court's statement to mother that it was "going to give [mother and father] all of the services [the court] can give on a no-, or low-cost basis to try and get the baby back to you."

10

**DISPOSITION**

The orders are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.

HOFFSTADT


We concur:


_____, Acting P. J.

ASHMANN-GERST


_____, J.

CHAVEZ

11